# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

SHARON L. WELLS,　　　　　*　　CIVIL NO. 4:08-CV-00357-JEG-TJS
　　　　　　　　　　　　　　*
　　　　Plaintiff,　　　　　　*
　　　　　　　　　　　　　　*
　　v.　　　　　　　　　　　*　　**REPORT AND**
　　　　　　　　　　　　　　*　　**RECOMMENDATION**
　　　　　　　　　　　　　　*
PATTI WACHTENDORF, STEVEN　*
COOK, and KATHERINE SOHN,　*
　　　　　　　　　　　　　　*
　　　　Defendants.　　　　　*

## I.  INTRODUCTION

This case was brought by Sharon Wells, an inmate at the Iowa Correctional Institution for Women in Mitchellville, Iowa, under 42 U.S.C. § 1983.  While Wells asserts various claims and constitutional violations, her primary complaints center on the treatment of her medical needs by the medical staff at the Institution.

The case was referred to the undersigned magistrate judge for the purpose of a report and recommendation, and an evidentiary hearing was held at the Institution on May 19, 2010. (*See* Initial Review Order and Order Referring Case to Magistrate Judge Thomas Shields (Document No. 25).  Given the multitude of pleadings which have been filed by Wells, who is proceeding pro se, a review of the procedural history and claims, and voluminous documents and motions filed by Wells, is necessary before reporting on the evidence presented by the parties at the hearing.

## II. PROCEDURAL HISTORY, CLAIMS, AND PENDING MOTIONS

Sharon Wells initiated this case by submitting a handwritten documented entitled "Combined Motion for Emergency Court Order (Release to General Population)" which was received and filed by the Clerk of Court on September 5, 2008. (*See* Document No. 1.) The document contained a variety of complaints related to her conviction and imprisonment, and included a request for appointment of counsel. (*Id.*) In a Prescreening Order (Document No. 3) entered on September 10, 2008, the court denied the requests for immediate intervention and for appointment of counsel, and instructed Wells to complete a section 1983 form.

After the case was dismissed because Wells failed to comply with the Prescreening Order, the case was reopened on March 16, 2009, at the request of Wells, and counsel was appointed to represent her in the matter. (*See* Order Reopening Case (Document No. 10).) Appointed counsel entered an appearance and filed a Report to the Court (Document No. 16) on September 9, 2009. Counsel stated he did not believe Wells had any grounds to go forward with the case or that a complaint could be written which complies with Federal Rule of Civil Procedure 11. (*Id.*)

On November 10, 2009, Wells filed a Combined Pro Se Motion for Court Order Due to Violation of Constitutional Right/Motion to Withdraw Appoint New Counsel (Document No. 18). In an Order (Document No. 19) entered November 16, 2009, Magistrate Judge Celeste Bremer indicated counsel would be allowed to withdraw after he filed an amended complaint, but denied the request for new counsel. (*Id.* at 2.)

On December 7, 2009, Wells filed pro se a Motion for Emergency Court Order (Document No. 20). Magistrate Judge Bremer denied the motion and directed still-appointed

counsel to check on the safety of Wells and note her claims in drafting the amended complaint. (*See* Order (Document No. 21).)

On December 16, 2009, appointed counsel filed an Amended Complaint (Document No. 22) on behalf of Wells.  The complaint asserts claims against Patti Wachtendorf who is the warden at the Institution, Steven Cook who is the sole doctor at the Institution, and Katherine Sohn who is identified as the individual responsible for the operation of the mail room. (*Id.* ¶¶ 7 - 9.) The complaint alleges Dr. Cook has failed to provide adequate treatment for a variety of medical disorders suffered by Wells including diabetes and an abscess. (*Id.* ¶ 12.)  The complaint further alleges Wachtendorf and Sohn have allowed staff at the Institution to take Well's legal mail, which caused Wells to lose actions in state court related to her conviction. (*Id.* ¶ 13.)  In addition to seeking money damages, Wells seeks an order restraining defendants from continuing their constitutional violations.

On December 17, 2009, several documents submitted by Wells herself were received and filed by the Clerk of Court which include a "Motion to Commence U.S.C. 42 § 1983 Court Order to Amend Petition by Former Counsel and Proceed Pro Se" (Document No. 23) and a "Motion to Show Cause" (Document No. 24).  In the Motion to Commence, Wells asserted various complaints including, but not limited, harassment, retaliation, verbal abuse, cruel and inhuman treatment, excessive punishment, denial of rights to file grievances, confiscation of legal and personal property, medical malpractice, denial of proper supplies for wound care, and kidnapping.

In an Initial Review Order (Document No. 25) entered December 18, 2009, the court allowed Wells' appointed counsel to withdraw and found the Complaint (Document No. 22),

as plead, was not frivolous.  The case was then referred to the undersigned magistrate judge for the purpose of an evidentiary hearing.

On January 11, 2010, Wells filed a "Combined Motion to Recast Petition and True Defendants, et al., and Emergency Hearing, Appointment of Counsel" (Document No. 26). Wells again asserted a multitude of complaints including, but not limited to, her previous court-appointed counsel downplaying her issues which she claims "include the endangerment and acts of constant punishment, assault, threats not to write grievances or kites.  I am draining pus, and medical is ignoring me." *Id.* at 6.

On January 13, 2010, Wells filed a "Motion to Submit Calendar Entry" (Document No. 27).  She again raises numerous allegations regarding the treatment of her medical condition and her incarceration, and asks for an evidentiary hearing.  Following the "Motion to Submit Calendar Entry", but still a part of Document No. 27, is an "Emergency Petition for Restraining Order of Protection." *Id.* at 3-10.  Wells reasserts the variety of complaints contained in her previous filings.

On January 28, 2010, Defendants' filed their Answer (Document No. 28) to the Amended Complaint, followed by a Motion for Summary Judgment (Document No. 29) filed on February 1, 2010.

In an Order (Document No. 30) entered March 2, 2010, defendants were directed to respond to Wells' motions by March 12, 2010, and Wells was directed to file a response to the Motion for Summary Judgment by April 1, 2010.  Defendants filed a Resistance to Plaintiff's Motion for Injunctive Relief (Document No. 32) on March 12, 2010.

On April 5 and 6, 2010, Wells filed a "Motion for Relief From Judgment or Orders" (Document No. 35), a "Combined Motion to Appoint Counsel and Order for Medical Exam for Further Evidence" (Document No. 36), "Plaintiff's Resistance & Objection to Summary Judgment/Motion to Object to Defendant's Summary Judgment, and to Proceed to Evidentiary Hearing" (Document No. 37) and a "Motion to Receive Response to Commence 1983 Combined Request of Temporary Restraining Order or House Arrest" (Document No. 38). On April 26, 2010, Wells filed a "Motion for Emergency Court" (Document No. 40). Again, Wells raises several complaints in line with her previous filings with the court.

The evidentiary hearing was held at the Institution in Mitchellville, Iowa, on May 19, 2010. In addition to providing her own testimony, Wells called inmates Robin Vinzant and Carrie Moser to testify. Dr. Cook testified on his own behalf. Defendants also called Cheryl Overlin, a Nursing Supervisor at the Institution, to testify. The parties also submitted exhibits which are addressed below.

This magistrate judge considers the record closed for the purposes of the evidentiary hearing. Wells has continued to file pleadings, however, including a "Motion to File Correspondence/Request for Order" (Document No. 43) on June 8, 2010; "Motion to Cease Interaction Between Plaintiff, and Medical Due to Emotional Stress & Refusal to Treat (Document No. 49) on August 18, 2010; "Motion to Commence 1983 Due to Defendant(s) Retaliation & Failure to Respond to Motions (Document No. 50) on September 3, 2010; "Motion to Reimburse Expenditures, Postage, Copies, Etc." (Document No. 51) on September 3, 2010; "Combined Motion & Affidavit" (Document No. 53) on September 14, 2010; "Motion to Grant Judgment Due to Failure by Defendants to Answer" (Document No.

54) on September 22, 2010; and "Combined Motion of Response to Appoint Counsel for Medical Exam" (Document No. 55) on September 22, 2010.

The various non-dispositive requests made by Wells throughout her numerous pleadings, including her requests for appointment of new counsel, are addressed in a separate order by this magistrate judge.

The following Report and Recommendation on the various substantive claims raised by Wells throughout her pleadings is made to United States District Court Judge James E. Gritzner.

## III.  FINDINGS OF FACT

As reflected in the docket record, Wells has submitted numerous self-written documents containing a multitude of complaints and allegations against the named defendants and other individuals, and multiple requests for relief from the court.   The following facts were presented through testimony during the evidentiary hearing.

## A.  Testimony of Sharon Wells

At the beginning of her testimony, Wells complained that the Institution took a computer disc from her about two weeks before the evidentiary hearing which prevented her from typing her legal work. (Tr. at 29.)  The disc had been provided to her by the education department for the Institution. (Tr. at 29.)  She believes it is unfair that she is not able to keep possession of the computer disc for her legal work. (Tr. at 29.)

Wells also complained about the grievance procedures at the Institution:

The procedures that are used in the grievances and the informals, even with medical and other departments, they have a way that you cannot follow through procedure.  You know, I was cut off.  I do my informal, the gentleman

> that handles informals would say something negative or derogatory towards
> me, "Follow procedure, do this, or stop."  They stopped me.  The grievances,
> I never got any kind of real help or investigations, none.

(Tr. at 30.)  In Wells' opinion, "grievances, disciplines, and appeals would lead nowhere but to denials." (Tr. at 39.)

She further claims legal papers and personal items have been tampered with, destroyed or taken from her by the Institution. (Tr. at 30, 51.)  She also believes it is unfair that she is required to pay for postage and copies of her legal papers because she can not afford the costs. (Tr. at 30-31.)  She claims to have lost both her appeal on her criminal conviction and a civil action against the Institution and Dr. Cook in 2005 because of interference with her legal work. (Tr. at 51-52.)

Wells also complained about being placed in segregation, which she described as a "dangerous room" without a bed, desk or chair, where she contracted a staph infection.  (Tr. at 32-33.)  In her opinion, she has been treated "like an animal" and "worse than any inmate" at the Institution. (Tr. at 33.)  She claims her medical records and behavior logs have been altered. (Tr. at 33.)  She was also upset that she was told she would need to pay $200 for a bedside visit with her dying mother, and then $480 to attend the funeral, when another inmate only had to pay $200 to attend a funeral. (Tr. at 33.)

In regard to her medical condition, Wells states she has a disease called supra hidradenitis and has been "fighting" the medical department since 2005 after she fell down stairs. (Tr. at 40.)  She claims she was mistreated by a nurse, who kicked her, and complains that Dr. Cook failed to send her to the hospital. (Tr. at 40.)  She contends she "got an abscess where [she] fell, and it grew and grew and grew." (Tr. at 41.)  In 2005, she was discharged

from the custody of the IDOC and was given a bottle of antibiotics and other medicine by Dr. Cook. (Tr. at 41.)

Wells eventually returned as an inmate in the IDOC in 2007 and had surgery for her "disease" at Oakdale before returning to the Institution after four months of recovering. (Tr. at 41-42.) She complains of the care she then received from Dr. Cook and nurses who she claims "verbally abused" her. (Tr. at 42.) She claims Dr. Cook gave her Vaseline instead of the actual medication cream she was supposed to use for her wound. (Tr. at 42.) She also claims to have asked for pain medication but was told by Dr. Cook that she "was drug seeking." (Tr. at 44.)

At some point, Wells developed a large abscess, which she claims Dr. Cook "wouldn't cut into . . . to take the pressure off", which then burst and was "full of green liquid." (Tr. at 44.) She was transferred to a hospital where they removed the abscess. (Tr. at 44.)

In addition to complaining about the treatment she received, Wells also claims there are "things" in her medical records that are not true. (Tr. at 43.) She contends her medication and her diagnosis have been changed and claims Dr. Cook "has submitted negative remarks to another doctor, causing him to refuse treatment I need." (Tr. at 34.) She alleges Dr. Cook told her "he was going to put them in there. He said I wasn't taking him to the cleaners. He said, 'I'm going to tell them that you're a liar, that you're a manipulator.'" (Tr. at 43.)

Wells requests that another doctor exam her to verify her disease and the extent of her wounds. (Tr. at 44.) She contends she suffers from "a painful disease, . . . very painful, excruciating" and that her "body is tore" and "is bleeding." (Tr. at 44.)

On cross-examination, Wells acknowledged she goes to the medical department three times a day for her medication and the medical staff checks her glucose level. (Tr. at 47.)

## B.  Testimony of Robin Vinzant

Robin Vinzant, who had known Wells for a couple of years, testified she has noticed "specific nurses kind of shunning [Wells] and giving [her] a hard time" but was able to identify only one nurse by name, Pam Tam. (Tr. at 10-11.)  Vinzant also testified as to a change in the Institution's policy as to the amount of medications inmates were allowed to keep in their possession. (Tr. at 11.)  In response to Wells' inquiry as to whether she was aware Wells was disciplined for having too many medications, Vinzant responded: "Yeah. And I thought that wasn't fair because we could - - some people could have them and some people couldn't, and I didn't understand why you couldn't." (Tr. at 11-12.)  Vinzant had noticed Wells being transported to the medical department in chains and believes Wells may have been targeted by medical staff:

> I would just see [Wells] coming to medical in chains from the hold for getting a major or disciplines from medical.  And I still am kind of baffled as to why so many - - one person is so targeted - - well, I felt it was targeted from medical.
>      And, you know, [Wells] and I don't hang out, so I don't want anybody to think that - - that I'm totally on Ms. Wells' side because, you know, I've had some good experiences with medical and some bad ones, but I think she's had way many more bad experiences with medical, and I don't understand it.

(Tr. at 12.)

On cross-examination, Vinzant confirmed that Wells went to the medical department three times a day, which is normal for inmates taking medications. (Tr. at 13.)  Vinzant also conceded the one nurse she identified as shunning Wells "belittles people.  I've had that

experience with her as well." (Tr. at 13.)  When asked to explain the shunning, Vinzant explained:

> Just like you ask questions and she wants to shoo you away.  I mean, I feel it's our body, it's our - - what's going on with us, we should be able to ask questions.  And, you know, clearly there's one - - there's a sign up that says no questions asked in med line and you have to kite everything, and it's a hassle.
>
> * * *
>
> And when you're wanting to know what's going on with your body right then and there, if you're afraid, it's not the nicest situation.

(Tr. at 14.)  In regard to Wells' specifically, Vinzant stated:

> Well, I think she's very - - asks a lot of questions about her body and wants to know what's going on. . . . And I feel like she just wants to know what's going on, and nobody wants to take the time to tell her.  I think if that - - At least in my personal feelings, if someone would have done that with her, you know, instead of making her feel like she was a nuisance, maybe it wouldn't have come to this.

(Tr. at 15.)

## C.  Testimony of Carrie Moser

Carrie Moser, who has known Wells since 1998 or 1999, testified "things started getting a little more difficult" for Wells at the Institution. (Tr. at 18.)  When asked by Wells to explain "difficult," Moser responded:

> A lot of medical issues were happening, I feel.  I know that I've heard you complain a lot about being not treated fairly.  And also I notice a lot of in your personality was like you were becoming bitter, maybe.  You weren't as friendly, you know, after a while.

(Tr. at 18.)  Moser did not believe Wells was disruptive, but was frustrated and struggling "just trying to get some answers and just trying to be treated fairly." (Tr. at 19.)  Moser noted Wells was treated differently than other inmates by being put on kite restrictions and limited

in her use of a computer. (Tr. at 19.)  Moser further testified that Wells' possessions were searched at one point and a computer disc Wells used for legal work was taken from her. (Tr. at 20.)  According to Moser, while she was Wells' mentor in a treatment unit, Wells' legal work was searched on three separate occasions over a four month period. (Tr. at 24.)  Moser commented that other inmates' materials were not searched as frequently as Wells' materials, but also stated that every inmate is searched once a month. (Tr. at 24-25.)

## D.  Testimony of Dr. Steven Cook

Dr. Cook is a licensed physician and has been the medical director at the Institution for six years. (Tr. at 54-55.)  He considers Wells to be a "pretty frequent" visitor and described her main medical concern as a "hidradenitis suppurativa condition that led to [the] skin graft surgery in late 2007, and has required a lot of attention over the last couple of years." (Tr. at 57.)  According to Dr. Cook,

> [h]idradenitis is a disorder of the sweat and oil glands that are different than the normal sweat glands you have on your skin.  They're just specialized glands that exist under our arms and in your groin, and they're much more oily.
> And we don't know why it happens, but for some reason those glands start to plug up, and they don't discharge the oil out of the skin and form pockets of oil and moisture that then become infected recurrently.  And they can vary - - the condition can vary from something minor, occasional problems here and there, to more sever, which is Ms. Wells' problem, was quite severe.
> Because as the infections recur, you get into chronic infections that are painful, and they will only respond to antibiotics for a short period of time and then the infection recurs, and so the definitive management for severe cases is to excise the skin and the under lying oil glands that are infected and disordered.
> And what happened in Ms. Wells' case is that she underwent this excision, this wide excision of two or three inches in width from the inguinal groin area down towards the rectum, and then had a - - that segment of skin was excised and then a skin graft was placed in that area, and that, then, is a

> slow healing skin graft that is where we've been giving her attention over the
> last couple of years.

(Tr. at 58.)  Dr. Cook explained that the graft is slow healing because "in the groin there's

a lot of friction from skin and movement and moisture, and so hygiene's important." (Tr. at

59.)  He also noted that Wells' healing was complicated because she is diabetic. (Tr. at 59.)

Because of those difficulties, Wells was given "daily dressing changes that would be

modified, depending on how the healing process was proceeding." (Tr. at 59-60.)  As

described by Dr. Cook, "it's an ongoing process of lubrication, antibiotics, dressing

coverage, and then modifying it, depending on the response and the success." (Tr. at 60.)

The open wounds would get infected which were treated with topical antibiotic ointments

or creams. (Tr. at 60.)

Dr. Cook also noted that other complications ensued because the hidradenitis problem

Wells experienced in the groin started to spread to sweat glands in other parts of her body,

and the same infections started to occur in those areas including the perirectal region, under

her abdomen, and under her breasts. (Tr. at 60-61.)  While agreeing Wells had one large

abscess on her buttocks, Dr. Cook considers the other abscesses as relatively small in medical

terms. (Tr. at 67-68.)

According to Dr. Cook, aside from informal visits, he has had 36 face-to-face

physician encounters with Wells over the last two years, which does not include her

"ongoing questions, concerns, blood sugar management, diabetic medication changes, and

. . . chart reviews and medication reviews that are done." (Tr. at 62.)  He noted Wells'

diabetic condition requires monitoring her blood sugar, adjusting the dose of her insulin, and

dietary restrictions which vary in frequency depending on the status of her condition. (Tr. at 63-64, 69.)

In Dr. Cook's opinion, the groin area has been "successfully treated" except periodically Wells will have a "little slight breakdown in the groin" and above the buttocks crease. (Tr. at 60, 61-62.)  He noted her condition was validated by a follow-up visit to the University of Iowa hospital in July of 2009. (Tr. at 62.)  He believes Wells "is doing very well." (Tr. at 62.)

Dr. Cook acknowledges there have been interpersonal problems in dealing with Wells. (Tr. at 64.)  From his perspective,

> [t]here's been a pattern that has evolved over the last couple of years where questions, sometimes very legitimate questions about her care, are asked, and answers are given, and yet the question comes up in a repeated kite or with nurses or on the next visit.
> For example, if I were - - if she were to say, "I have blood coming from out of my ribs," as she did on a visit here a few months ago, I would, of course, be concerned, and I would examine her.  And once examining her and not finding anything, I would reassure her that there is no blood or pus coming out of your ribs, and she would not accept that answer.
>
> * * *
>
> She would insist that something had to be done in some vague general way that I had trouble comprehending.
>
> * * *
>
> The pattern has been of cyclical seemingly random complaints that run through a series of days to weeks, then to come up with some other concern days to weeks later, then to come up with some other concern days to weeks later.

(Tr. at 64-65.)  Dr. Cook admitted he has "stated clearly in the record that [he finds Wells] to be manipulative and deceitful" based on his examination and Wells' history and behavior. (Tr. at 77.)  When asked if he still sees Wells, Dr. Cook responded "absolutely" but noted

he does have to use some judgment in terms of frequency of assessments with any inmate.

(Tr. at 65.)

On cross-examination by Wells, Dr. Cook refuted her belief that the medical department is hostile towards her, stating

> I'm not sure I would characterize it that way, Sharon.  I think that I can become frustrated, and I can't speak for the nurses, but I would suspect that there's probably some nurses that become frustrated by the difficulties we've had in trying to work with you, yes.

(Tr. at 67.)   When asked why he failed to take Wells out of segregation, Dr. Cook noted he did not have the authority to remove her from segregation. (Tr. at 80.)

Dr. Cook also refuted Wells' claims that he denied her appropriate pain medication for her condition, and her characterization of the normal pain caused by hidradenitis as excruciating. (Tr. at 73-75.)  When asked why he stopped her Tylenol, Dr. Cook responded:

> As I recall, at that point your wounds had healed very well and you were doing much better in terms of your capacity to stay active and ambulate.  You were out of the wheelchair.  Your condition had improved, and there were really no sources of pain that I could identify.

(Tr. at 79.)

Dr. Cook also rejected Wells' claim that there was a need to take x-rays after she fell in the Institution's courtyard "[b]ecause there was no clinical evidence of a fracture." (Tr. at 72.)  He further responded: "as it turns out, you weren't injured because you were seen shortly thereafter in my office and nothing was found." (Tr. at 73.)

## E.  Testimony of Cheryl Overlin

Cheryl Overlin is the nursing supervisor and has been employed at the Institution for twenty-six years. (Tr. at 82-83.)  She currently oversees 11 nurses. (Tr. at 83.)  She noted

Wells comes often to the medical department, including the pill line three times a day. (Tr. at 83-84.)  According to Overlin, the pill line is just to distribute medications and not for inmates to raise questions. (Tr. at 84.)  As she explains, there are "so many people coming for pill line that we have to get through, and you can't assess someone very thorough through a pill window in front of other inmates." (Tr. at 84.)  An inmate who raises a question in the pill line may be told, "You need to follow the proper procedure." (Tr. at 84.)

In regard to pain medication, Overlin noted an inmate can purchase Tylenol through the Institution's commissary, in addition to being provided by a nurse or ordered by the physician. (Tr. at 84-85.)  Under the current procedure for administering medication, an inmate may be given blister cards, and when the cards are empty the inmate needs to bring them back before being provided with additional cards. (Tr. at 85.)  Wells was given medication cards at various times but is no longer provided with them because the Institution found she had more pills in her possession that what she should have had, including 450 Tylenol, during a room search. (Tr. at 86.)  Overlin noted Wells can still purchase Tylenol from the canteen or the nurses can provide Tylenol to her if there is a need. (Tr. at 86.)

Overlin also acknowledged there have been some interpersonal issues, on occasion, between Wells and the nursing staff. (Tr. at 88-89.)  As explained by Overlin, there are

> set schedules for Wells to come at certain times, and she comes outside those schedules, and then she complains because the nurses get upset with her.  And she argues, has been argumentative.
>
> * * *
>
> She has complained numerous times that we aren't doing what she thinks we should do.

(Tr. at 89.)

Overlin estimates she receives at least two or three kites a week from Wells which are "[b]asically the same complaints." (Tr. at 90.)  Overlin's normal procedure in responding to the kites includes looking at her chart to make sure Wells has been seen and her issue has been addressed, then writing her back. (Tr. at 89.)  If Wells is scheduled to see the doctor, Overlin would tell Wells to address her concerns at her next visit. (Tr. at 89.)  When she receives kites from Wells repeating the same issue or complaint, Overlin may answer one and then attach the other kites. (Tr. at 91.)

Overlin does not believe Wells is being denied medical care and notes Wells is being seen on a weekly basis by nurses as scheduled for dressings. (Tr. at 90.)

## F.  Exhibits Admitted During and After Evidentiary Hearing

During the hearing, Wells offered numerous documents in support of her claims.  The documents were grouped, marked as Plaintiff's Exhibits 1 and 2, and admitted at the time of the evidentiary hearing. (*See* Text Minute Entry (Document No. 42).)  Defendants' Exhibit A was also offered and admitted during the hearing. (*Id.*)[1]

Wells indicated there were additional documents on a computer disc which she desired to have access to and potentially submit to the court in support of her claims.  After the hearing, counsel for defendant informed the court that Wells had access to the disc, and desired to submit the additional documents.  In the interest of justice, the court allowed the

---

[1]  The original exhibits, which included numerous handwritten kites and notes by Wells, were copied and scanned by court personnel, then filed and placed into the record as Document No. 46.  The court notes the copies of some documents are difficult to read, if not illegible.  The Clerk of Court was directed to preserve and maintain the original documents until this case has been fully completed. (*See* Order on Evidentiary Hearing Exhibits (Document No. 45) at 2.)

admission of those documents. Counsel for defendant was directed to obtain the documents from Wells and file them as a group, marked as Plaintiff's Exhibit 3. (*Id.*) Those documents were filed on August 11, 2010.

Plaintiff's Exhibit 1 (Document No. 46) is a collection of miscellaneous documents submitted by Wells including a document entitled "An Inmate's Plea for Justice Unfounded," documents related to disciplinary matters and grievances, and a hand-written statement she prepared for the evidentiary hearing. Plaintiff's Exhibit 2 is a collection of hundreds of pages of kites, written complaints and other notes made by Wells while at the Institution (Document No. 46-2, 46-3, 46-4) and a collection of Withdrawal Orders (Document No. 46-5) showing withdrawals taken from Wells' personal account at the Institution for copies and postage for her legal work.

Plaintiff's Exhibit 3 (Document Nos. 48, 48-1, 48-2, and 48-3) is a collection of nearly 200 pages of documents which include motions, kites, disciplinary, grievance and appeal papers, and other documents drafted by Wells setting forth various complaints against the Institution.

Defendants' Exhibit A (Document No. 46-6) is a medical Activities Report for Wells for February 1, 2010 through April 30, 2010. The Report shows Wells received various, multiple medical treatments during the time period including physician encounters and chart reviews by Dr. Cook, and multiple nurse encounters, dressing changes, and blood glucose tests by the staff.

# IV.  ANALYSIS OF LEGAL ISSUES

## A.  Injunctive Relief

Throughout her filings, Wells requests injunctive relief.   The well-established "Dataphase factors" are applied when addressing such a request:

> (1) the probability of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) whether the issuance of an injunction is in the public interest." *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 485-86 (8th Cir. 1993)(citing *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981)(en banc).

*Entergy, Arkansas, Inc. v. Nebraska*, 210 F.3d 887, 898 (8th Cir. 2000).  These factors apply in considering whether to issue a temporary restraining order or a preliminary injunction. *See Doe v. Miller*, 216 F.R.D. 462, 468, (S.D. Iowa 2003); *Sports Design & Dev., Inc. v. Schoneboom*, 871 F.Supp. 1158, 1162-63 (N.D. Iowa 1995).

"'The party seeking injunctive relief bears the burden of proving these factors.'" *CDI Energy Servs., Inc. v. West River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009)(quoted citation omitted).  "'No single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh towards granting the injunction.'" *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994)(quoted citation omitted).  A party moving for injunctive relief, however, must show the threat of irreparable harm. *Id.*

After weighing all the factors in this case, this magistrate judge finds no basis to issue any injunctive relief sought by Wells.  Although Wells characterizes her medical condition as serious and requiring immediate attention, she has not sufficiently shown the threat of

irreparable harm by any substantive facts or that the issuance of an injunction is in the public interest.  Contrary to her repeated pleas to this court, there is no credible evidence that Wells' condition constitutes an emergency situation requiring immediate attention.  Moreover, as set forth below, in this magistrate judge's opinion, there is no probability of success on the merits of her claims.

Therefore, it is recommended that Wells' requests for injunctive relief be denied.

## B.  Defendants' Motion for Summary Judgment (Document No. 29)

Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56.  The motion was properly supported by a Memorandum (Document No. 29-1), Statement of Undisputed Material Facts (Document No. 29-2), and an Appendix (Document No. 29-3).  Wells submitted a Resistance & Objection to Summary Judgment, with a Motion to Object to Defendant's Summary Judgment, and to Proceed to Evidentiary Hearing, which was filed jointly as Document No. 37.  Although Wells' filings fail to meet the requirements of Local Rule 56, this magistrate judge fully considered her response and challenges to the motion for summary judgment, especially in light of her pro se status.

Summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  The party opposing a properly supported motion "'may not rest upon the mere allegations or denials of [her] pleading, but

. . . must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(quoting Fed. R. Civ. P. 56(e)).

Here, defendants assert they are entitled to judgment as a matter of law because Wells failed to exhaust the administrative remedies available to her as required by 42 U.S.C. § 1997(e)(a). The Prison Litigation Reform Act of 1995 (PLRA) requires prisoners to exhaust prison grievance procedures before filing suit. *Jones v. Bock*, 549 U.S. 199, 211, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). The exhaustion provision states:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). The phrase "civil action with respect to prison conditions" is defined as meaning

> any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison, but does not include habeas corpus proceedings challenging the fact or duration of confinement in prison.

18 U.S.C. § 3626(g)(2).

Failure to exhaust is an affirmative defense which defendants have the burden to plead and prove. *Bock*, 549 U.S. at 216; *Nerness v. Johnson*, 401 F.3d 874, 876 (8th Cir. 2005). Defendants pled failure to exhaust in their Answer (Document No. 28, ¶ 18) and, based on the record presented to this court, defendants have met their burden in proving the defense.

The record establishes that Wells did not properly exhaust the available administrative remedies as to the claims raised in the Amended Complaint, various other filings, or orally

at the evidentiary hearing.  Defendants submitted an Affidavit  (Document No. 29-3) of Kris

Weitzel, who is employed as the IDOC Central Office Co-Grievance Coordinator, which

summarized the grievance process for inmates as follows:

> Generally, an inmate must seek informal resolution as to his grievance issue
> prior to filing a grievance.  Then, any grievance filed will be investigated and
> answered by the grievance officer or any other applicable prison official.  An
> inmate may then appeal that response to the Warden, or his designee, at the
> institution wherein the inmate is incarcerated.   If dissatisfied with the
> grievance appeal response, the inmate may then take a second appeal to the
> Central Office of the IDOC.  A response by the Central Office of the IDOC
> represents exhaustion of the administrative process.  When an offender files
> such a grievance appeal at this level, the entire grievance packet is forwarded
> to the IDOC for an evaluation of the claim.

(*See* Weitzel Aff. ¶¶ 4-5.)  Attached to the Affidavit is the IDOC Policy and Procedures for

Offender Grievance Procedures. (Ex. A to Weitzel Aff.)

According to Weitzel, Wells had several grievances at the Institution which were not

fully exhausted in the grievance process. (*Id.* ¶ 6.)  Wells did have 5 grievance appeals that

reached the IDOC level during 2008. (*Id.* ¶ 7.)  One appeal concerned a disciplinary issue

and was considered to be a non-grievable matter; two appeals were not considered because

Wells failed to follow proper procedures; a fourth appeal regarding Wells' request to have

a second storage trunk was denied, and finally another appeal as to the confiscation of a

computer disc which Wells contended contained legal work was denied because it was

determined that it did not contain such materials. (*Id.* ¶¶ 8-12.)

In her Resistance & Objection to Summary Judgment (Document No. 37), Wells

contends she "was in fact denied, and punished from following the proper procedure." *Id.* at

1.  She further alleges the "Administration and Central Office each condoned the acts

committed by the Correctional Officers involved, and took drastic measures to protect those officers from having their actions questioned or investigated." *Id.* at 2.  Also, she claims the "Central Departments interfered and ruled against the numerous grievances, and disciplinary Appeals without considering the evidence, lack of investigation, [and] false statements." *Id.* In Wells' opinion, "[n]o actual evidence and factual statements were used." *Id.*

During the evidentiary hearing, when asked if she filed grievances, Wells responded, "It doesn't do me any good, sir." (Tr. at 49.)  She later acknowledged she

> filed quite a few [grievances] because I wasn't getting any response. . . . I've downplayed the grievances when I found out they weren't going anywhere. I've kind of downplayed them.  Only time I file it is when there is a need, when there is - - I am worried about my condition or if I want to be seen and no one's responding to that.  Then I'll do an informal, and then I will do the grievance.

(Tr. at 50.)  She further acknowledged she knows the steps of the grievance process. (Tr. at 51.)

Wells' contentions that grievance procedures at the Institution are futile and she is somehow punished or retaliated against for following proper procedures are not supported by any underlying facts.  After examining Wells' submissions to the court, this magistrate judge fails to find specific facts in the record which sufficiently support her assertions.  At most, Wells' claims appear to be based on nothing more than her subjective beliefs.  As noted by the Eighth Circuit, however, "§ 1997e(a) does not permit the court to consider an inmate's merely subjective beliefs, logical or otherwise, in determining whether administrative procedures are 'available'." *Lyon v. Vande Krol*, 305 F.3d 806, 809 (8th Cir. 2002).  Based on the facts which this magistrate judge finds to be credible, Wells failed to

exhaust the administrative remedies available to her on the various claims she raises in this lawsuit.

Dismissal of a federal action is mandatory if administrative remedies are not completely exhausted at the time of the filing of the prisoner's lawsuit. *Johnson v. Jones*, 340 F.3d 624, 627 (8th Cir. 2003).  In the words of the United States Supreme Court, "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Bock*, 549 U.S. at 211.  Consequently, even though an evidentiary hearing was held, the court need not reach the merits but is required to dismiss without prejudice any claims which are unexhausted. *See Lyon*, 305 F.3d at 807, 809 (although case went to trial, dismissal of complaint was required because inmate failed to exhaust administrative remedies and defendants did not waive defense); *Chelette v. Harris*, 229 F.3d 684, 688 (8th Cir. 2000)(remanding with directions to dismiss complaint without prejudice where record showed failure to exhaust).

Therefore, it is recommended that Defendants' Motion for Summary Judgment (Document No. 29) be granted and the Amended Complaint (Document No. 22) and other claims raised by Wells be dismissed without prejudice.

If this recommendation is not adopted by the District Court Judge, and in the interests of justice and judicial efficiency, the merits of the constitutional claims alleged by Wells shall be analyzed in light of the evidence presented at the evidentiary hearing and in the written record**.**

## C.  Merits of Alleged Constitutional Violations

As noted above, this case is brought pursuant to 42 U.S.C. § 1983.  To succeed on section 1983 claims, Wells "must establish the 'deprivation of a constitutional right.'" *Gonzales-Perez v. Harper*, 241 F.3d 633, 637 (8th Cir. 2001).  In other words, she must prove defendants deprived her of a right secured by the Constitution or laws of the United States. *Id.*  After considering the testimony presented during the evidentiary hearing and reviewing the written documents submitted by the parties, this magistrate judge finds no support, either in fact or under law, to support Wells' variety of claims of constitutional violations.

Title 42 U.S.C. § 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action of law, suit in equity, or other proper proceeding for redress.

"Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 501 U.S. 266, 271, 114 S.Ct. 807, 811 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144, n. 3, 99 S.Ct. 2689, 2694, n. 3, 61 L.Ed.2d 433 (1979)).  Section 1983 only provides a remedy for violations of federal rights, or "rights, privileges, or immunities secured by the Constitution and laws [of the United States]." 42 U.S.C. § 1983; *see Maine v. Thiboutot*, 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980) ("Constitution and laws" allows remedies for violations of rights provided by federal statute, as well as those provided by the Constitution.)  Therefore, "[t]he first step in [a section 1983] claim is to identify the specific constitutional right

allegedly infringed." *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989); *Baker*, 443 U.S. at 140.[2]

Here, Wells asserts a variety of complaints and constitutional violations. In the Amended Complaint (Document No. 22) filed by appointed counsel, Wells alleges her rights of free speech under the First Amendment of the United States Constitution and to be free from cruel and unusual punishment under the Eighth Amendment have been violated. During the evidentiary hearing, Wells testified that she considers the treatment she receives at the Institution to be cruel and unusual punishment. (Tr. at 36.) She also believes she is retaliated against by the staff at the Institution and her constitutional rights and "human rights have all been violated." (Tr. at 45.) She considers her medical treatment to be a "major part' of her complaint but also states "[i]t's assault, it's false imprisonment, it's - - it covers violations of my Eighth, Fourth, Fifth, Sixth and Fourteenth Amendment rights." (Tr. at 48.)

In this magistrate judge's view, the primary complaint raised by Wells is that her constitutional rights under the Eighth Amendment have been, and continue to be, violated by inadequate treatment of her medical needs. Consequently, the Eighth Amendment claim will be analyzed first, followed by an examination of Wells' other claims.

## 1. Eighth Amendment - Deliberate Indifference

The Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. A violation of the Eighth Amendment occurs when a prison official acts deliberately indifferent to an inmate's serious medical needs or to conditions posing a

---

[2] The second step in a section 1983 claim is to establish that the individual who allegedly deprived plaintiff of her constitutional rights acted under the color of state law. There appears to be no dispute that the named defendants in this case acted under the color of state law.

substantial risk of serious future harm.  *Estelle v. Gamble*, 429 U.S. 97, 104-05, 97 S.Ct. 285,

50 L.Ed.2d 251 (1976)(existing serious medical need); *Helling v. McKinney*, 509 U.S. 25,

33, 113 S.Ct. 2475 (1993) (risk of future harm).  "This is true whether the indifference is

manifested by prison doctors in their response to the prisoner's needs or by prison guards in

intentionally denying or delaying access to medical care or intentionally interfering with the

treatment once prescribed." *Estelle*, 429 U.S. at 104-05.

The first requirement of an "objectively serious medical need" is responsive to

To succeed on a section 1983 claim of deliberate indifference, Wells "'must prove an

objectively serious medical need and that the prison officials knew of the need but

deliberately disregarded it.'" *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) (quoting

*Gordon ex rel. Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006)(citing *Crow v.

Montgomery*, 403 F.3d 598, 602 (8th Cir. 2005)); *see also Nelson v. Shuffman*, 603 F.3d 439,

448 (8th Cir. 2010); *Nelson v. Correctional Med. Servs.*, 583 F.3d 522, 528-29 (8th Cir. 2009);

*Vaughn v. Gray*, 557 F.3d 904, 908 (8th Cir. 2009).

The first requirement of an "objectively serious medical need" is responsive to

"contemporary standards of decency."  *Hudson v. McMillian*, 503 U.S. 1, 8, 112 S.Ct. 995,

117 L.Ed.2d 156 (1992) (quoting *Estelle*, 429 U.S. at 103).  "Because society does not expect

that prisoners will have unqualified access to health care, deliberate indifference to medical

needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at

9.  To constitute an "objectively serious medical need," the need must be supported by

medical evidence or must be so obvious that a layperson would recognize the need for a

doctor's attention. *Phillips v. Jasper County Jail*, 437 F.3d 791, 795 (8th Cir. 2006); *Aswegan

v. Henry*, 49 F.3d 461, 464 (8th Cir. 1995).

To meet the second requirement, a plaintiff must prove prison officials had a state of mind that was "deliberately indifferent" to the plaintiff's health or future well being. *Farmer v. Brennan*, 511 U.S. 825, 839-40, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Helling*, 509 U.S. at 32.  As held by the Supreme Court,

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate human conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837.  In this manner, the Court adopted the standard of "subjective recklessness," as used in criminal law, as the test for "deliberate indifference." *Id.* at 839-40. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842 (internal citations omitted).

An inmate may prove deliberate indifference by showing the complete deprivation of medical care; however, total deprivation is not necessary for finding a constitutional violation. *Langford*, 614 F.3d at 460.  "Grossly incompetent or inadequate care can [also] constitute deliberate indifference, as can a doctor's decision to take an easier and less efficacious course of treatment." *Id.* (quoting *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990) (citations omitted)).

Beginning with the first element, a serious medical need, Wells undoubtedly suffers from a variety of medical ailments which, at times, may have risen to the level of a serious

medical need.  For example, her diabetes and the large abscess she developed would certainly constitute serious medical needs.

On the other hand, Wells expresses other concerns regarding her health which are clearly nothing more than overstatements as to her true medical condition.  Other than her bare assertions, there is no medical evidence in the record to support many of her health complaints, or the extent of those complaints.  Such bare assertions, standing alone, are insufficient for a viable claim. *See Aswegan*, 49 F.3d at 464; *Kayser v. Caspari*, 16 F.3d 280, 281 (8th  Cir. 1994)(self diagnosis by inmate alone is insufficient to show serious medical need).

With regard to the second component, deliberate indifference, the record is devoid of credible evidence that any specific defendant consciously disregarded a substantial risk of serious harm or acted with deliberate indifference to Wells' health or safety.  As noted by the Eighth Circuit, "[t]he inmate must clear a substantial evidentiary threshold to show the prison's medical staff deliberately disregarded the inmate's needs by administering inadequate treatment." *Nelson*, 603 F.3d at 448-49.  The evidence submitted by Wells fell well-short of the threshold.

At most, Wells has merely shown a personal disagreement and dissatisfaction with the treatment she has received at the Institution.  Wells' difference of opinion with the course of treatment provided to her by Dr. Cook and the nursing staff, however, is not sufficient to show deliberate indifference. *See id.*  As repeatedly noted by the Eighth Circuit, "'mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Langford*, 614 F.3d at 460 (quoting *Alberson v. Norris*, 458 F.3d 762, 765 (8th

Cir. 2006)(quoting *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995))).
Similarly, "defendants 'do not violate the Eighth Amendment when, in the exercise of their
professional judgment, they refuse to implement a prisoner's requested course of treatment.'"
*Vaughn*, 557 F.3d at 909 (quoting *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996)).

Contrary to Wells' claims, it does not appear that Dr. Cook or other staff have ignored
her allegations of pain or refused her appropriate medical treatment.  Instead, the evidence
establishes that Dr. Cook and the Institution's medical staff have responded reasonably to her
various complaints and, utilizing their professional judgment, provided appropriate medical
treatment for Wells' various conditions.

Wells' repeated dissatisfaction with the timeliness of the medical treatment she
receives at the Institution also fails to establish a constitutional violation.  Again noted by the
Eighth Circuit, "[t]he Constitution does not require jailers to handle every medical complaint
as quickly as each inmate might wish." *Jenkins v. County of Hennepin*, 557 F.3d 628, 633
(8th Cir. 2009).  Likewise, "a policy that results in delayed treatment is not unconstitutional
unless it evinces deliberate indifference to serious medical needs." *Id.*  Wells has not shown
any policy or procedures of the Institution's medical staff constitute deliberate indifference
to her serious medical needs.

Accordingly, Wells has failed to establish defendants violated the Eighth Amendment
by acting with deliberate indifference to her serious medical needs or to conditions posing
a substantial risk of serious future harm.

**2.  First Amendment - Retaliation**

Throughout her filings, Wells claims she was retaliated against for raising concerns regarding her medical treatment and other conditions and incidents at the Institution. "[A]ctions taken in retaliation for an inmate's filing of a grievance are actionable under 42 U.S.C. § 1983." *Nelson*, 603 F.3d at 449-50.  As analyzed under the First Amendment, to prevail on a retaliation claim, Wells must show she (1) engaged in a protected expression, (2) suffered an adverse action, and (3) the adverse action was causally related to the protected expression. *Id.* at 450.

Based on the record presented at the evidentiary hearing and in Wells' filings, there is insufficient credible evidence showing any specific adverse action was taken against Wells for requesting medical treatment or filing grievances.  Wells' claims of retaliation amount to nothing more than broad, bare assertions which have no underlying factual basis.  Without the requisite causal connection, Wells' claims of retaliation have no merit.

There is also no evidentiary support for Wells' claims that prison official's disciplinary charges were retaliatory.  "[A]n inmate's retaliation claim fails 'if the alleged retaliatory conduct violations were issued for the actual violation of a prison rule.'" *Bandy-Bey v. Crist*, 578 F.3d 763, 766 (8th Cir. 2009); *see also Hartsfiled v. Nichols*, 511 F.3d 826, 829 (8th Cir. 2008).  Here, there is no credible evidence indicating disciplinary charges against Wells were issued for any other reasons than for actual violations of prison rules.

**3.  Fourteenth Amendment - Segregation**

Wells also raises complaints regarding her placement into segregation.  The Eighth Circuit recently analyzed a similar claim under the Fourteenth Amendment:

> "In order to prevail on a Fourteenth Amendment due process claim, [the plaintiff] must first demonstrate that he was deprived of life, liberty, or property by government action."  To show he was deprived of a protected liberty interest, [plaintiff] must identify conditions that impose "atypical or significant hardship . . . in relation to the ordinary incidents or prison life."  "In order to determine whether an inmate possesses a liberty interest, we compare the conditions to which the inmate was exposed in segregation with those he or she could expect to experience as an ordinary incident or prison life. . . . We do not consider the procedures used to confine the inmate in segregation."
>
> "We have consistently held that a demotion to segregation, even without cause, is not itself an atypical and significant hardship."

*Orr v. Larkins*, 610 F.3d 1032, 1034 (8th Cir. 2010)(internal citations omitted).

Under those principles, Wells has failed to show she was deprived of a liberty interest while in segregation.  Although she claims the conditions in segregation were inhumane, there again is no credible evidence in the record to support her bare assertions.  Instead, the conditions Wells has experienced at the Institution appear to be consistent with those conditions she could expect as an ordinary incident of prison life.  As such, they do not rise to the level of a constitutional violation.  In addition, as testified to by Dr. Cook, the medical staff does not control the conditions of segregation at the Institution.

## 4.  Meaningful Access to the Courts

Wells also alleges several matters which appear to this magistrate judge to fall under a claim that her right of access to the courts has been violated, including allegations of legal mail being confiscated, requests for the cost of postage and copies of her legal work, and requests for access to a computer disc to prepare and store her legal work.

"Inmates have a constitutional right of meaningful access to the courts and the legal system." *Irving v. Dormire*, 586 F.3d 645, 648 (8th Cir. 2009)(citing *Lewis v. Casey*, 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *Bounds v. Smith*, 430 U.S. 817, 821, 823,

97 S.Ct. 1491, 52 L.Ed.2d 72 (1977)).  This right does not extend, however, to accommodate Wells' desire to have unlimited access to or personal possession of a computer disc to prepare and store her legal work, nor to unlimited payment of costs for postage and copies of her documents.  As noted by the Supreme Court, the law

> does not guarantee inmates the wherewithal to transform themselves into litigation engines  . . . .  The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement.  Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Lewis*, 518 U.S. at 355.  This magistrate judge is satisfied that the Institution has provided the necessary tools as required by the Constitution to provide Wells meaningful access to the courts.  The limitations placed on access to a computer disc, and the charges for postage and copies, appear to be well within constitutional bounds.

In addition, to establish an access-to-courts claim, Wells must show "'an actual injury, that is, the hindrance of a non-frivolous and arguably meritorious underlying legal claim.'" *Bandy-Bey*, 578 F.3d at 765 (quoting *Hartsfield*, 511 F.3d at 831); *see also Entzi v. Redmann*, 485 F.3d 998, 1005 (8th Cir. 2007); *Moore v. Plaster*, 266 F.3d 928, 933 (8th Cir. 2001); *Cody v. Weber*, 256 F.3d 764, 768 (8th Cir. 2001).  Wells has not sufficiently shown that her ability to pursue a specific non-frivolous claim in the courts has been hindered or impeded by any defendant or other individual named in her filings.  Although the taking of legal papers can be a constitutional violation, Wells has not provided the court with credible evidence supporting her claim or shown how the alleged destruction or confiscation of any of her

papers impeded her right of access to the courts.  As such, she has failed to show an actual injury from the alleged violations.

## V.  RECOMMENDATION

For the reasons stated above, it is recommended that the injunctive relief requested by plaintiff Sharon Wells be denied.

It is further recommended that Defendants' Motion for Summary Judgment (Document No. 29) be granted and the Amended Complaint (Document No. 22) and other claims raised by plaintiff Sharon Wells be dismissed without prejudice based on the failure to exhaust administrative remedies.

Finally, upon consideration of the merits, it is recommended that judgment be entered in favor of defendants on all claims raised by plaintiff Sharon Wells in this action.

**IT IS ORDERED** that, pursuant to 28 U.S.C. § 636(b)(1), the parties have to and including **October 29, 2010,** in which to file written objections, unless an extension of time for good cause is obtained. *See Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990).  Such extensions will be freely granted.  Any objections must specify the specific portions of this Report and Recommendation to which objections are made, and set forth the basis for such objections. *See* Fed. R. Civ. P. 72.  Failure to timely file objections may constitute a waiver of a party's right to appeal questions of fact. *Thompson*, 897 F.2d at 357.

Dated September 28, 2010.

_____
**THOMAS J. SHIELDS**
**CHIEF U.S. MAGISTRATE JUDGE**